**KELLUM v. BETHLEHEM STEEL CORPORATION et al.**

**No. 2583.**

District Court, D. Maryland.

April 14, 1943.

James E. Tippett, Bernard S. Melnicove, and Henry S. Bonebrake, all of Baltimore, Md., for claimant.

L. Vernon Miller and Marbury, Gosnell & Williams, all of Baltimore, Md., for Bethlehem Steel Corporation.

Bernard J. Flynn, U. S. Atty., of Baltimore, Md., for Deputy Commissioner.

WILLIAM C. COLEMAN, District Judge.

This case arises upon a petition of the claimant to review and set aside an order of the Deputy Commissioner of the United States Employees' Compensation Commission appointed pursuant to the provisions of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 901–950 incl., wherein an award of compensation was denied the claimant for loss of eyesight.

The jurisdiction of the Deputy Commissioner in the present case is not questioned. He has filed in the case his findings of fact upon which his order is based, and they are not disputed in so far as they relate to the occurrence and character of the injuries suffered by claimant, and to the medical treatment which claimant received for them. The Deputy Commissioner rejected the claim for compensation for the reason that he found claimant's injuries had no causal relation to his loss of vision.

The facts found by the Deputy Commissioner, as the result of rather extensive testimony taken before him, may be summarized as follows:

Claimant began work for the Bethlehem Steel Corporation, Baltimore, in August, 1940, and was assigned to scaling rust from ships, after having undergone the usual physical examination to which this Company was accustomed to subject its employees, including an eye test. On December 16 and 18, 1940, claimant was engaged in removing scale from the hull of the S. S. Bethore which was in the steel company's dry dock undergoing repairs, and in the course of this work particles of scale got into claimant's left eye. Claimant was treated by his employer's first aid service on the premises, the pupil of his left eye was dilated, and a very small foreign body was removed from the cornea of that eye. But he continued to have trouble with his vision and on December 21st he was referred by the Company's plant physician to the Wilmer Institute, Johns Hopkins Hospital, for examination. This disclosed that with respect to the right eye the optic nerve was somewhat edematous, the retina veins congested and gorged, and also the optic nerve of the left eye indicated there was some beginning of edema, or swelling, of that eye; that the left eye at that time as corrected by glasses was practically normal, but that the claimant's vision was so bad in the right eye, namely 20/200s, that he was industrially blind, i.e., he could see only at twenty feet what he should have been able to see at two hundred feet.

Subsequent to the examination in December, 1940, just referred to, the claimant returned to work, but was given a milder type of employment, namely, sweeping up around the plant. On January 31, 1941, he was assigned to the work of applying a cement wash to water tanks on the S. S. American Sailor which was then in dry dock. On that day, claiming that some of this wash had gotten into his eyes, he was given first aid treatment at the plant and was then again sent to Johns Hopkins Hospital for further examination and treatment. In April, 1941, he remained in the hospital for a week and then continued to receive treatment as an out patient for a number of weeks, which included neurological treatments, in order to ascertain what, if any, other conditions might be affecting his eyesight. By April the left eye had deteriorated to some extent and the right eye had deteriorated greatly, and by July, sight in the left eye had disappeared almost completely, that is to say, vision in that eye was only 5/200s, and was worse in the right eye, namely, 3/200s. During this extended period of hospital observation and treatment, among the doctors who attended the claimant were the same doctors who had examined and treated him in the previous December.

On April 1, 1942, formal claim for compensation was filed with the United States Employees' Compensation Commission by the claimant, based upon alleged loss of vision in both eyes and inability to return to work. At the hearing of this claim before the Deputy Commissioner in May and June, 1942, the testimony was taken of two of the physicians who had treated the claimant's eyes following the injuries to them in both December, 1940, and January, 1941. Testifying on behalf of the employer, they both stated that claimant's loss of vision was neither caused nor in any sense aggravated by the injuries received in the course of his work, but that his loss of vision had been brought about by some independent, pre-existing condition involving the optic nerve—by some disease of the central nervous system such as multiple sclerosis, that is, that the impairment was organic rather than traumatic in origin.

Following the taking of testimony before the Deputy Commissioner, the claimant, with the approval of counsel for both parties, was referred to the United States Public Health Service, United States Marine Hospital, Baltimore, for additional examination. This was made by the surgeon in charge, who reported his findings to be that the claimant was suffering from bilateral central scotoma which had destroyed central vision and which resulted from pathology in the optic nerve—known as retrobulbar bilateral neuritis, of organic and not of traumatic origin, that is, not the result of any external injury to claimant's eyes.

Still another examination of claimant was made at the instance of the United States Public Health Service by a well known Baltimore neurologist who had not theretofore seen the claimant. This neurologist's findings were to the effect that preceding claimant's first eye injury in December, 1940, there had been present a toxic neuritis of the optic nerve on both sides, more marked on the right than on the left, with some disturbance of vision at that time, of which, however, claimant was not conscious until dilatation of the pupil of the left eye had been produced, in the course of treatment given him in December because of the foreign body in his left eye, thus interfering with the vision of that eye; and that then, for the first time, the claimant became conscious of his impaired vision, because up to that time his left eye had seemed to afford him satisfactory vision. In short, this neurologist reported that he did not believe claimant's trouble was due to multiple sclerosis or to any other disease of the nervous system, but to optic neuritis of toxic origin which antedated the eye injuries which are the basis of the present claim. He declined to express an opinion as to whether such injuries might have aggravated such neuritis, since, as he said, this was a question for the ophthalmologist.

In addition to the foregoing verbal and written testimony, the Deputy Commissioner had before him the testimony of the claimant himself and of one other physician, a neurologist and psychiatrist, who appeared on behalf of claimant and who had examined claimant on November 15, 1941, and several times thereafter. This physician disagreed completely with the diagnoses of all of the other physicians. He testified that, in his opinion, the injuries which the claimant had suffered to his eyes in the previous December and January were the cause of his loss of vision, and that he found no evidence of multiple sclerosis or any organic disease of the claimant's nervous system such as might account for his blindness.

The well established principle that must govern this Court in reviewing the action of the Deputy Commissioner is that it is not the weight of the evidence that controls, but merely whether there is substantial evidence present in the record as it comes from the Deputy Commissioner that supports his conclusion. That is what is meant by the language of the Act (Sec. 21(b), 33 U.S.C.A. § 921(b), that "If not in accordance with law, a compensation order may be suspended or set aside, in whole or in part * * *." There can be no trial de novo of the facts in the absence—which is the case here—of a jurisdictional question. South Chicago Coal & Dock Company v. Bassett, 309 U. S. 251, 60 S.Ct. 544, 84 L.Ed. 732; Parker v. Motor Boat Sales, 314 U.S. 244, 62 S.Ct. 221, 86 L.Ed. 184.

In the present case we have the diagnoses of five physicians, three of whom are in agreement that claimant's eye injuries suffered in the course of his employment by the defendant company in no sense caused his blindness; and one of the remaining two agrees that these injuries could not have caused the blindness, but expressed no opinion as to the possibility of their having aggravated it, because, not being an ophthalmologist, he considered himself un-

qualified to do so. Two of these four doctors saw the claimant on numerous occasions beginning only a few days after his first injury occurred, and for nearly a year thereafter. The remaining two did not have the same opportunities for extended observation of claimant's trouble, but, on the other hand, they were called in as completely neutral experts without any prior knowledge whatsoever of claimant's case, and one reached the same, and the other virtually the same, conclusion as did the other two doctors who had a very intimate knowledge of claimant's case. The only physician who stood out against the testimony of these four physicians was not an eye doctor, but a neurologist and psychiatrist testifying on behalf of the claimant, and it is significant to note he made no examination of the claimant until approximately a year after the eye injuries which are the basis of his claim had occurred.

The weight of the evidence is thus overwhelming in favor of the findings of the Deputy Commissioner. However, as has already been pointed out, the test does not lie in the answer to the question, "what is the weight of the evidence", but rather in the answer to the question "whether, regardless of the weight of the evidence, was there testimony presented to the Deputy Commissioner from which a reasonable mind could infer that the loss of claimant's vision did not result from or was not aggravated by, the injuries to his eyes in December, 1940, or January, 1941?"

Harsh as the ruling may seem, and indeed contrary as it may appear to be to the normal presumption that the layman would be disposed to make in a case of this kind, we find nothing that in any respect challenges the credibility of the four physicians whose findings the Deputy Commissioner has adopted, or the complete reasonableness of their conclusions.

 In analyzing medical testimony, full credit must be given to the character of that testimony, provided it comes from the mouth of one who, by reason of his professional education and clinical experience, it is reasonable to assume knows whereof he speaks, and does so honestly. In the present case, the Deputy Commissioner's findings are unqualifiedly supported by three eye specialists, two of them associated with one of the outstanding eye clinics in the country; and the third also of unimpeached standing and experience. In addition, one of Baltimore's well known neurologists is in substantial accord. The only testimony to the contrary is that of one physician who makes no claim to being an eye specialist but is a psychiatrist and neurologist, and he first saw the claimant almost a year after the injuries to his eye had occurred. There is not the slightest bit of evidence indicative of any lack of good faith on the part of any of the physicians who testified that they could find no causal connection between claimant's eye injuries and his distressingly progressive loss of vision. There is no suggestion of distortion of the facts or of the slightest digression from the strict requirements of professional conduct by them. Furthermore, because of the unusual, and indeed baffling character of the present case, the Deputy Commissioner, on his own initiative, reached out for additional, independent aid in the solution of the problem presented to him, and asked the United States Health Service for an opinion, which confirms what the Johns Hopkins' ophthalmologists had already testified to.

Counsel for claimant stress the argument that the reasonable probability is not that the first accident alone which claimant suffered to his left eye in December, 1940, but *that* accident, *combined with the second* accident in January, 1941, to his already damaged eyes, was the primary cause of his progressive loss of vision. In support of this theory, claimant's counsel argue that the experts who testified before the Deputy Commissioner had no knowledge of this second accident. Suffice it to say in answer to this argument that, while one of the Johns Hopkins' physicians did testify that he had no record of the cement solution getting into the claimant's eyes in January, this is believed to be immaterial because, when such fact was called to his attention, this physician, as well as the other physicians who gave similar testimony, was unshaken in his statement that he found no evidence from which it was reasonable to conclude that claimant's loss of vision had, in any sense whatsoever, been the result of *any* external or traumatic causes.

With respect to the specific argument of aggravation advanced on behalf of claimant, namely, that even though the injuries which claimant suffered to his eyes in December, 1940, and January, 1941, may not have been the *cause* of his ultimate loss of vision, they nevertheless aggravated it, counsel for claimant assert that it is a strange coincidence—too strange to be ac-

cepted as within the range of probability—that if, as the physicians testifying on behalf of the defendant company asserted, claimant would have gone blind eventually, his blindness should have commenced *immediately* after the injuries to his eyes which he suffered in December, 1940, and January, 1941. However, this argument assumes premises that are not supported by the testimony in the case. In the first place, there is no evidence that some impairment of claimant's vision had not already taken place as the result of organic trouble prior to these injuries, because, while it is true that when he began his employment with the defendant company in August, 1940, he was passed by the Company's physician as having acceptable vision, there is nothing in the evidence to indicate that more than a rather superficial examination was made of his eyesight, to determine whether it was industrially acceptable. Also, this argument ignores what is believed to be the most vital point in the case, and which puts the stamp of complete reasonableness upon the testimony of the physicians which the Deputy Commissioner adopted, namely, that in December, when the pupil of claimant's left eye was dilated, his vision in that eye, although impaired, was not nearly so much impaired as was his vision in his right eye, and thus it compensated for the latter; but when this dilatation occurred, claimant then, for the first time, became really conscious of the extent of the impairment. In other words, the situation is not unlike that which is known to be quite common, namely, that individuals have for years been completely deprived, or nearly so, of the sight of one eye without being at all conscious of that fact, until something happens to the other eye, when, for the first time, they learn that they have been seeing entirely, or almost entirely, through one eye.

Claimant's counsel rely on such cases as Cumberland & Allegany Gas Company v. Caler, 157 Md. 596, 146 A. 750; Neeld Construction Company v. Mason, 157 Md. 571, 146 A. 748; Townsend Grace Company v. Ackerman, 158 Md. 34, 148 A. 122. However, those cases, when properly analyzed, support, rather than refute, the position adopted by the Deputy Commissioner, for they do no more than state the Maryland rule as to what grounds of probability may be sufficient to amount to legal proof. What the Court was called upon to determine in those cases was whether there was a reasonable basis for the inference of a causal relation between certain injuries and the ensuing condition of the injured party—whether there was only one reasonable inference which a jury could draw from particular facts, if presented to it. In the present case, we are called upon to determine whether the testimony of those physicians upon which the Deputy Commissioner relied has a reasonable basis in fact. To say that it does not would be tantamount to saying that if a physician's diagnosis appears to a layman's mind to be strange and based upon conclusions beyond the realm of probability, then such diagnosis must be rejected and the layman's views substituted therefor. The mere statement of any such principle is sufficient to indicate its fallacy.

At the outset of this opinion we have stated what is clearly settled in the law—that it is of no consequence, upon review of the Deputy Commissioner's action, that there is a conflict in the testimony or even that the evidence may preponderate strongly against the position taken by him. In the present case, the preponderance of the evidence weighs greatly in favor of the conclusion of the Deputy Commissioner, but, as just stated, even if it did not do so, we would still be required to affirm his action as long as there was any substantial evidence in support of it. It is not the function of the Court to re-weigh the evidence and draw conclusions.

Claimant's plight is very distressing and serious, especially because he is only twenty-five years old. But, for the reasons as above set forth, the order of the Deputy Commissioner denying an award of compensation in this case must be affirmed.